**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000547
21-OCT-2016
08:43 AM**

NO. CAAP-12-0000547

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


MAKILA LAND CO., LLC, Plaintiff-Appellee, v.
JOHN PAUL KAPU AND JONAH KE'EAUMOKU KAPU, Defendants-Appellants,
and HEIRS OR ASSIGNS OF KUA (K), KAINOA (W), ALSO KNOWN AS
KAINOA KIKUE OLALA (W), AND SAMUEL HIKU KAHALA; VICTORIA
Q. WHITE; KALANI KAPU, AND ALL WHOM IT MAY CONCERN,
Defendants-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 09-1-0397(1))

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Ginoza, JJ.)

Defendants-Appellants John Paul Kapu (a.k.a. John Paul

Kekai Kapu a.k.a. Paul Kekai Kapu a.k.a. John Paul Kekai a.k.a.

Paul Kekai, hereinafter **John**) and his son, Jonah Ke'eaumoku Kapu

(a.k.a. Ke'eaumoku Kapu, hereinafter **Ke'eaumoku**) (collectively,

the **Kapus** or **Defendants**) appeal from the Final Judgment filed May

8, 2012 (**Judgment**), in the Circuit Court of the Second Circuit

(**Circuit Court**),[1] which concluded that Plaintiff-Appellee Makila

Land Company, LLC (**Makila** or **Plaintiff**) is the owner in fee

simple of the real property "in Apana 1 of Land Commission Award

---

[1] The Honorable Rhonda I. L. Loo presided.

4878-O, Royal Patent 2664, to Olala, situate[d] at Puehuehuiki and Wainee 2, Lahaina, Maui, Hawaii within TMK (2) 4-6-21-4[.]" The Judgment was entered pursuant to three orders of the Circuit Court: (1) an order filed April 29, 2010 (**April 29, 2010 Order**), which granted Makila's summary judgment motion filed on November 18, 2009, as to Makila's paper title claim, and denied Makila's summary judgment motion as to the Kapus' adverse possession counterclaim; (2) an order filed October 28, 2010 (**October 28, 2010 Order**), which granted in part and denied in part Makila's September 2, 2010 summary judgment motion that sought dismissal of the Kapus' title by adverse possession counterclaims with prejudice; and (3) an order filed March 22, 2012 (**March 22, 2012 Order**), which granted Makila's February 14, 2012 summary judgment motion that sought dismissal with prejudice of the Kapus' adverse possession counterclaim.[2]

The Kapus allege that the Circuit Court erred in holding that Makila was entitled to summary judgment on its claim of paper title, as well as on the Kapus' counterclaim for adverse possession, and allege that the evidence raises genuine issues of material fact as to whether Makila's evidence of title is superior to the Kapus' ownership claims.

I. BACKGROUND FACTS AND PROCEDURAL HISTORY

A. Procedural history

On May 26, 2009, Makila filed a complaint against the "Heirs or assigns of KUA (k), KAINOA (w), also known as KAINOA

---

[2] The Honorable Joel E. August entered the April 29, 2010 Order and the October 28, 2010 Order while the Honorable Rhonda I. L. Loo entered the March 22, 2012 Order.

2

KIKUE OLALA (w), and SAMUEL HIKU KAHALIA; VICTORIA Q. WHITE; KALANI KAPU; JONAH KE'EAUMOKU KAPU, and ALL WHOM IT MAY CONCERN," in order to establish Makila's fee simple title to Apana 1.[3]

On July 27, 2009, the Kapus filed an answer and counterclaim.[4] Their counterclaim alleged that:

> 7. Defendants are descendants of Olala, the original awardee of Apana 1, LCA 4878-[O], RP 2664, and, as such, are the owners of the real property described in Plaintiff's Complaint.
>
> 8. Defendants and their predecessors in interest have been in actual, open and notorious, continuous, exclusive, hostile and adverse possession of the property described in Plaintiffs' Complaint for more tha[n] ten years prior to May 4, 1973, and continuously thereafter and, therefore, own the property by adverse possession.
>
> 9. Defendants and their predecessors in interest have been in actual, open and notorious, continuous, exclusive, hostile and adverse possession of the property described in Plaintiff's Complaint for more tha[n] twenty years, and, therefore, own the property by adverse possession.

The Kapus demanded that the court dismiss Makila's complaint, order that the Kapus, as descendants of Olala, are the owners of the real property at issue, and order that the Kapus are the owners of the property "free and clear of all claims of the Plaintiff."

Makila filed its first motion for summary judgment on November 18, 2009, asserting that the evidence established, as a matter of law, that title was vested in Makila and that the evidence did not support any of the Defendants' title by descent claims. The Kapus submitted a memorandum in opposition (and

---

[3] The designations of "(k)" and "(w)" appear to represent the words "kane" and "wahine", the Hawaiian words for "man" and "woman", respectively. Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 128, 377 (rev. ed. 1986).

[4] Answers and counterclaims were filed by other defendants claiming interest in the land as well.

further memoranda were filed). After a hearing was held, on April 29, 2010, the Circuit Court entered an order (1) granting Makila's summary judgment motion as to its paper title claim but (2) denying its summary judgment motion as to the Kapus' adverse possession counterclaim. The court concluded that no genuine issues of material fact existed concerning Makila's paper title to Apana 1, but that issues of material fact existed as to the Kapus' adverse possession counterclaim.

Makila filed a motion for summary judgment for dismissal of the "Kapu Defendants'" adverse possession counterclaims with prejudice on September 2, 2010. The "Kapu Defendants" included not only John and Keʻeaumoku, but also Defendant Kalani Kapu. The Kapus (John and Keʻeaumoku) filed a memorandum in opposition and Makila filed a reply. After a hearing, on October 28, 2010, the motion was granted in part and denied in part. The court concluded that Kalani Kapu, as well as additional defendants Victoria Nohealani Kaluna-Palafox and Victoria White, have no claim to title by adverse possession, but that issues of material fact existed concerning John and Keʻeaumoku's adverse possession claim. Thus, summary judgment was again denied without prejudice as to the Kapus' adverse possession counterclaim.

On January 14, 2011, Makila once again moved for summary judgment for dismissal of the Kapus' adverse possession counterclaims with prejudice. The Kapus filed a memorandum in opposition and Makila filed a reply. After a hearing, on February 24, 2011, this motion was denied without prejudice, with

4

the court concluding that "there are genuine issues of material fact which preclude granting said motion[.]"

On February 14, 2012, Makila again moved for summary judgment for dismissal with prejudice of the Kapus' adverse possession counterclaim. The Kapus filed a memorandum in opposition and Makila filed a reply. This time, however, after a hearing on the motion, on March 22, 2012, the Circuit Court entered an order granting summary judgment on the Kapus' adverse possession claim.

On May 8, 2012, the Circuit Court entered the Judgment, pursuant to the April 29, 2010 Order, the October 28, 2010 Order, and the March 22, 2012 Order, concluding that:

> [F]inal judgment in this quiet title action is hereby entered in favor of Plaintiff and against all defendants, their heirs and assigns, and all unknown persons claiming an interest in Apana 1 of Land Commission Award 4878-O, Royal Patent 2664, to Olala, situate[d] at Puehuehuiki and Wainee 2, Lahaina, Maui, Hawaii within TMK (2) 4-6-21-4, that Plaintiff MAKILA LAND CO., LLC, is the owner in fee simple and entitled to possession of the real property described above, and is entitled to issuance of a writ of possession.

A writ of ejectment for the removal of the Kapus from Apana 1 was subsequently filed on May 8, 2012. The Kapus timely appealed the Judgment on June 4, 2012.

B.    Makila's Paper Title Claim

Makila claims to trace title in the property at issue, Apana 1 of Land Commission Award (L.C.A.) 4878-O, Royal Patent (R.P.) 2664 (hereinafter "Apana 1"), back to the original awardee of the land. Unless otherwise noted, the following documents were submitted along with Makila's November 18, 2009 motion for summary judgment. In sum, beginning with the original land grant award, Makila submitted various probate, marriage, and death

records, deeds, leases, and other evidence in support of its paper title claim.

Makila produced copies of L.C.A. 4878-O and Royal Patent 2664, as well as translations[5] of these documents, as they were originally written in Hawaiian. According to the translations, Apanas 1, 2, and 3 of L.C.A. 4878-O, R.P. 2664 were awarded to Olala by King Kamehameha IV in 1856.

Makila produced copies of the pages of a Maui Probate Book in support of its claim that the heirs of Olala were judicially determined. Although these pages purportedly identified Olala's heirs, they were in Hawaiian and no translation was provided.

Makila also provided copies of three deeds and their respective English translations as evidence that Olala had at least three children: the oldest, a daughter named Kaikaamolani, the second, a son named Waihoikaea Olala, and the youngest, a son named Kua.

The translation of the first deed, indicated as "Kaikaamolani to Waihoikaea Olala", reads:

> Know all men by this, Kaikaamolani of the town of Lahaina Island of Maui, one of the children of Olala who lived here previously, and is recently deceased, witnesseth: the aforesaid Kaikaamolani on the first part, for the receipt in my hand the sum of One Dollar from Waihoikaea Olala - one of the children of Olala who is deceased, one of the heirs from Lahaina, Island of Maui, on the second part. I hereby transfer, release and relinquish all of my interest forever - to have and to hold unto Waihoikaia Olala, the second party, and his/her heirs and successors forever, my interest and rights in my share of the assets and estate, with all the benefits belonging to the first party at law

---

[5] All translations of Hawaiian language documents referenced in this memorandum have been signed and certified as true and correct to the best of their respective translators' abilities and are accompanied by declarations to that effect.

and in equity in all those parcels of land situate at Puehuehuiki & "Waineenui 2" at Lahaina Maui being Royal Patent Number 2664 in the name of Olala, our father, and the boundaries in the said Royal Patent Number show a total area of 5 Acres 2 Roods 9 Rods.[6] This land of Olala, was brought before John Richardson and our mother Kawehineai Olala was appointed administrator and she managed it upon his death. The estate has never been distributed between us, his children, and in order to make it all known the first party, and for his/her heirs, successors, administrators, that all of the interests mentioned, there is no rights, estate, nothing at law, no interest belonging to any of them in the lands mentioned above because of the execution of this instrument. In witness hereof the first party hereby signs its name and affixes its seal on this Twentythird day of July in the year Eighteen Hundred and Sixty Six.

This deed was signed by Kaikaamolani and recorded in 1873.

The translation of the second deed, a partition deed between "W. Olala & Kauhai", reads:

This agreement executed on this 16th day of August in the year Eighteen Hundred and Eighty Three between Waihoikaea Olala (m) from Lahaina, Island of Maui, on the first part, and Kauhai (m), of Haiku, Island of Maui on the second part. The following is the statement of the aforesaid Waihoikaea Olala (m) - He is the Number 2 born to Olala (m) who died at Lahaina Maui and Kaikaamolani (f) the first born, is deceased. Kua (m) was the last born and he is dead be the aforesaid Kua has a son named Kauhai (m) and whereas we two are the only ones who have an interest remaining outside of Kaikaamolani's interest. Therefore, by this know all men we two hereby petition, transfer and convey absolutely unto Kauhai, the second party, and for his heirs, successors and assigns all that parcel of land situate at Waineenui Lahaina, Maui being Apana 2 in Royal Patent Number 2664 to Olala Land Commission Award 4878. It is our wish that Kua's portion shall be granted to his son Kauhai and this shall serve as the consideration.
We two, the parties stated above, mutually agree to this partition and conveyance and we have no further claim nor do our heirs, administrators, trustees and executors from hereafter.

The second deed was signed by Waihoikaea Olala and Kauhai and recorded in 1883. Note that this deed does not mention Apana 1.

---

[6]    The translation of Royal Patent Number 2664 indicates that the parcels awarded contain "an area of 5 Acres 3 Roods 9 Rods, more or less."

The translation of the third deed from "Waihoikaea to Kainoa" reads:

> Know all men by these presents, I Waihoikaea (m) from Kauaula, Lahaina, Island of Maui, witnesseth - Kainoa (f) my daughter/niece from the same place gave into my hand one dollar ($1.00) as good consideration, the receipt of which is acknowledged in this instrument, and for my love for her, I hereby sell, grant and convey absolutely and by this, sell, grant and convey unto Kainoa (f) for herself, and for her heirs and assigns forever all the parcels of land situate at Lahaina, Maui, being:
>
> First: All that piece of taro land and pasture situate at Puehuehuiki, Lahaina, Maui, being Apana 1 belonging to Olala my own father known in Royal Patent Number 2664 Land Commission Award 48780 containing an area of 1 Acre, 2 Roods, 26 Rods the boundaries of which are described in the said Royal Patent.
>
> Second: All that piece of land situate in the Ahupuaa of Kooka, Lahaina, Maui, known in Royal Patent Number 2726 Land Commission Award Number 6606, in the name of Puali, my uncle, containing an area of 1 Acre, 2 Roods and 7 Rods, the boundaries of which are described in the said Royal Patent.
>
> To have and to hold with all the rights and benefits appurtenant thereon unto Kainoa (f), her heirs and assigns forever. I hereby affirm that I have a valid interest to sell in the lands described above, and I shall warrant and defend the same should any persons contest the rights and benefits of Kainoa (f), her heirs and assigns forever. In witness hereof I sign my name and affix my seal on this 26[th] day of February in the year 1898, at Lahaina, Maui.

The translation also indicates that the deed was signed "Waihoikaea (his x mark)" and was recorded in 1898.

The determination of the heirs of Kainoa is complicated. Makila posits that Kainoa was also known as Kainoa Kikue Olala and had three children: Samuel Hiku Kahalia, Samuel Hakalaau, and Sarah K. Peter. Makila produced the following evidence which appear to support its contention:

(1) A death certificate for Samuel Hiku Kahalia, born March 10, 1883, and deceased May 18, 1949, which lists his father's name as "(Unknown) Hakalaau" and his mother as "(Unknown) Kainoa." The informant's signature on the death

certificate appears to read "Sam Hakalaau." The certificate indicates that Samuel Hiku Kahalia was a widower.

(2) A document that appears to be a search result from www.familysearch.org, a Church of Jesus Christ of Latter-day Saints website and lists the parents of Samuel Hakalaau, born December 19, 1882, as Hiku Hakalaau and Kainoa Kikue Olala.

(3) A 1951 deed from Samuel Hakalaau granting his interest in Apana 1 to Pioneer Mill Company, Limited (**Pioneer Mill**) referring to Sarah K. Peter as his sister and the person from whom he acquired interest in the property.

In conjunction with its reply to the Kapus' memorandum in opposition to the November 18, 2009 motion for summary judgment, Makila submitted the following documents:

(4) A 1928 lease by Samuel Hakalaau, Sarah K. Peter, and Samuel H. Kahalia to Pioneer Mill of "[a]ll of the southerly portion . . . of Apana 1" for fifteen years commencing on August 7, 1932.

(5) A 1943 lease by Samuel Hakalaau, Sarah K. Peter, and Samuel H. Kahalia to Pioneer Mill of "[a]ll the southerly portion . . . of Apana 1" for twenty years commencing on August 7, 1947.

(6) A 1997 affidavit by John stating that "Samuel Kapu (aka) Samuel Hakalaau is the son to Hiku Hakalaau and Kainoa Kukue Olala[.]" A record of marriage attached to the affidavit lists the groom as Samuel Kapu, his father as Hiku, and his mother as Kainoa.

Makila submits that Samuel Hiku Kahalia did not transfer away any interest in the property at issue before his death in 1949. Samuel Hiku Kahalia's death certificate indicates that he was a widower. Thus, Makila asserts that Samuel Hiku Kahalia's interest in Apana 1 descended to his siblings, Samuel Hakalaau and Sarah K. Peter. On appeal, Makila points out that despite publication notifying the heirs of Samuel Hiku Kahalia's of Makila's complaint, no heirs responded.

Makila also produced a January 27, 1951 deed in which, Samuel Hakalaau, who was indicated to be a widower, conveyed his interest in Apana 1 to Pioneer Mill, reserving the right to use and occupy the land for the rest of his life, for $1000 in consideration. The deed, which states that it is by and between Samuel Hakalaau as Grantor and Pioneer as Grantee, reads, in part:

> [T]he Grantor . . . does hereby grant, bargain, sell, convey and quitclaim unto the said Grantee, its successors and assigns, all of his right, title and interest, believed to be not less than a one-half (1/2) undivided interest, in R.P. 2664, L.C.Aw. 4878-O, Apana 1, reserving unto the Grantor, however, the right to the use and occupancy of the said premises for and during the remainder of the term of his natural life.

Makila also produced an October 19, 1951 deed in which Sarah K. Peter conveyed to Samuel Hakaalau her interest in Apana 1. The deed reads, in part:

> [Sarah K. Peter, a.k.a. the Grantor] does hereby grant, bargain, sell, convey and quitclaim unto the said Grantee [a.k.a. Samuel Hakalaau], his successors and assigns, all of her right, title and interest, believed to be not less than a one-half (1/2) undivided interest, in R. P. 2664, L. C. Aw. 4878-O, Apana 1, to Olala situated in Puehuehuiki, Kauaula Valley, District of Lahaina, County of Maui, Territory of Hawaii.

Further, Makila produced a November 5, 1951 deed in which Samuel Hakalaau conveyed the interest he received from Sarah K. Peter to Pioneer Mill, reserving the right to use and occupy the land for the remainder of his life, for $1000 in consideration. The deed read, in part:

> [Samuel Hakalaau a.k.a. the Grantor] does hereby grant, bargain, sell, convey and quitclaim unto [Pioneer Mill a.k.a. the Grantee], its successors and assigns, all of his right, title and interest, believed to be not less than a one-half (1/2) undivided interest, in R.P. 2664, L.C. Aw. 4878-O, Apana 1, to Olala situated in Puehuehuiki, Kauaula Valley, District of Lahaina, County of Maui, Territory of Hawaii, which he acquired from his sister, SARAH K. PETER, by deed dated the 19th day of October, 1951, reserving unto the Grantor, however, the right to the use and occupancy of the said premises for and during the remainder of the term of his natural life.

On January 16, 2001, Pioneer Mill conveyed certain properties to Makila. The properties were listed on a document attached to the deed labeled "Exhibit A." Apana 1 is not specifically named in Exhibit A. However, Makila alleges that the property designated in Exhibit A as Tax Map Key Number (TMK) (2) 4-6-21-4 includes Apana 1.

C.     The Kapus' Responses and Counterclaims

In opposition to Makila's November 18, 2009 motion for summary judgment on its paper title claim, the Kapus asserted that:

> The record shows that there are genuine issues of material facts which prevent the granting of Makila's motion for summary judgment, including:
>
> a)     Is KAINOA the same person as KAINOA KIKUE OLALA? [7]

---

[7]     After the court granted Makila's motion for summary judgment as to its paper title claim, additional evidence was produced that was counter to the Kapus' unsupported assertion that Kainoa and Kainoa Kikue Olala were different women. In a 2007 affidavit by John, which was submitted as an exhibit to the Kapus' motion to reconsider the court's granting one of Makila's motions *in limine*, John stated: "my Uncle Samuel Kapu (aka) Hiku Kapu

(continued...)

b)     Was KAINOA (w) the natural mother of Samuel Hiku Kahalia.

c)     Were Samuel Hiku Kahalia and Samuel Hakalaau both have KAINOA (w) as their natural mother.

d)     Were Samuel Hiku Kahalia, Samuel Hakalaau and Sarah K. Peter the natural children of KAINOA (w).

e)     If Samuel Hiku Kahalia, Samuel Hakalaau and Sarah K. Peter were natural children of KAINOA (w), were they also the only children of KAINOA (w).

f)     If Makila can establish paper title, which the Kapu Defendants deny, do the Kapu Defendants have ownership by adverse possession.

The Kapus allege that they are descendants of Olala through the aforementioned "Kainoa."  To support this argument, the Kapus submitted a declaration by Ke'eaumoku tracing their lineage as such:

a)     Kapu Hakalaau, also known as Samuel Kapu, was a natural son of Hiku and Kainoa (Exhibit "A").

b)     Kapu Hakalaau, also known as Samuel Kapu married Julia Kaleo (Exhibit "A")

c)     Kapu Hakalaau and Julia Kaleo had a son named John Paul Kekai Kapu.

d)     John Paul Kekai Kapu married Barbara Pualoke Ha'o.

e)     John Paul Kekai Kapu and Barbara Pualoke Ha'o had seven children, including myself, Jonah Ke'eaumoku Kapu, my brother Zachery Kalani Kapu and my sister Victoria Quailani Kapu White.

The referenced "Exhibit A" is Samuel Kapu's record of marriage which was attached to Ke'eaumoku's declaration.

In its reply to the Kapus' supplemental opposition, Makila referenced John's birth certificate, which does not indicate that his father was Kapu Hakalaau or Samuel Kapu, but identifies his father as "Harry Kapu" and his mother as "Julia

---

[7](...continued)
(aka) Samuel Kahalia Kapu is the son of Hakalaau (aka) Hiku Hakalaau who married Kainoa (aka) Kainoa Kukue Olala, who is the daughter of Waihoikaea (aka) Kukue Olala and Kaluahine Kapili[.]" John's 1997 affidavit also indicated that Samuel Kapu was also known as Samuel Hakalaau.

Manuia", although the text is difficult to read.[8] Makila also referenced John's marriage certificate, which lists John's father's name as "Harry Kapu" and his mother as "Julia Manuia." Makila also resubmitted the 1997 affidavit in which John states that "Julia Kealani Manuia Kekai (aka) Julia Kalani Akana (aka) Julia Kealani Kekai Kapu is my mother" and "Julia Kealani Kapu had given me to my father John Ku Kaleo (aka) John Kaleo Kekai, right after I was born to be raised with my father at Kauaula, Lahaina, Maui." Makila argued that this affidavit indicated that John was either the *hanai* child[9] or the illegitimate son of John Ku Kaleo a.k.a. John Kaleo Kekai.

As indicated, in its April 29, 2010 Order, the Circuit Court granted Makila's November 18, 2009 motion for summary judgment on its claim to paper title. Thus, the Kapus' counterclaim of paper title by lineal descent was, in effect, dismissed by this order. Nevertheless, evidence regarding the Kapus' lineage continued to be produced by both parties.

The Kapus' position became that the "Samuel Kapu" from whom they claim lineal descent was not the same person as "Samuel

---

[8]     John's birth certificate was attached as an exhibit to John's 1997 affidavit. The birth certificate indicates that John's birth name is "Paul Kekai Kapu."

[9]          Hanai refers to a child who is reared, educated, and loved by someone other than the natural parents. The hanai relationship occurs most often within the family, so the child is rarely raised by strangers. Traditionally, the permanent quality of the hanai relationship made it a near equivalent of legal adoption.

Melody Kapilialoha MacKenzie, The Lum Court and Native Hawaiian Rights, 14 U. Haw. L. Rev. 377, 391-92 (1992).

Hakalaau," the person from whom Makila traces paper title, and that no one in their family was called "Samuel Hakalaau."[10] However, this directly contradicts John's 1997 affidavit which states that "Samuel Kapu (aka) Samuel Hakalaau is the son to Hiku Hakalaau and Kainoa Kukue Olala[,]" and that "Julia Kealo Kaleo . . . married Samuel Kapu (aka) Samuel Hakalaau[.]"

In subsequent submissions, the Kapus included a photograph which John described in an accompanying declaration to be a picture of John "along with my hanai parents, Uncle Samuel Kapu and Auntie Julia Kaleo[.]" In a 2007 affidavit that the Kapus submitted to support their motion to reconsider the court's granting one of Makila's motions *in limine*, John refers to "Samuel Kapu (aka) Hiku Kapu (aka) Samuel Kahalia Kapu" and "Julia Kealo Kaleo" as his "Uncle" and "Aunt" who helped raise him. In this affidavit, John states that his mother was "Julia Kealani (aka) Kulia Kalani Akana" who was married to "Harry Kapu (aka) Hale Paihinui Kapu[.]"[11] He also states that his mother gave him to her brother, "John Ku Kaleo (aka) John Kaleo Kekai"

_____

[10] In a declaration supporting the Kapus' opposition to Makila's February 13, 2010 motion for summary judgment, John states:

> Uncle Sam Kapu, my hanai father, is not the same person as Samuel Hakalaau, and he never went by the name 'Samuel Hakalaau.' . . . To my knowledge, I am not related to any person named Samuel Hakalaau and there is nobody named Samuel Hakalaau in the Kapu family genealogy.

Ke'eaumoku makes the same claims as John in his declaration.

[11] Attached as an exhibit to this affidavit was a copy of John's birth certificate.

14

and his wife, Mikina, to be raised.[12] In a declaration submitted in support of the Kapus' opposition to Makila's February 13, 2012 motion for summary judgment, John states that "I am not the 'foster child' of Uncle Sam Kapu. Rather I am a hanai son of Uncle Sam Kapu." Also attached was a declaration by Ke'eaumoku in which he states that: "My father, John Paul Kapu, is not the 'foster child' of Uncle Samuel Kapu. Rather, he is a hanai son of Uncle Samuel Kapu." Ke'eaumoku identifies Julia Kaleo as the wife of Samuel Kapu. In a 2010 deposition, Ke'eaumoku stated that "Julia Kialo Kalio [sic]" was the woman who raised his father but was not his natural mother or "blood kin."

In sum, after the Circuit Court dismissed the Kapus' counterclaim of paper title by lineal descent, further evidence indicated that John's birth father was Harry Kapu and that John Ku Kaleo and/or Samuel Kapu are most accurately categorized as John's hanai fathers. The only evidence in the record indicates that, despite the Kapus' bare contentions to the contrary, Samuel Kapu was also known as Samuel Hakalaau.

The following excerpt from John's declaration in support of the Kapus' memorandum in opposition Makila's February 13, 2012 motion for summary judgment summarizes the Kapus' adverse possession claims:

---

[12] Thus, contrary to Makila's position that John could be the illegitimate child of John Ku Kaleo a.k.a. John Kaleo Kekai, this affidavit indicates that John Ku Kaleo was actually John's uncle and hanai father. Note also that attached to the 2007 affidavit as an exhibit is John's permanent school record which names his parents as "John Kaleo Kekai" and "Mikina Kaleo."

3. I was raised from my birth [in 1932] on the Olala Property which is the subject of this litigation (Apana 1 of LCA 4878-0).

4. As I grew up, I helped my family farm the lands, and the lands sustained ourselves and our extended family.

5. The Olala Property has always been used as the Kapu family cemetery, graveyard and burial area, both before my birth and always thereafter.

6. Many of my ancestors and kupuna are buried on the Olala property with burials occurring before and during my lifetime.

7. The burials are obvious to the eye, and many are marked with stone identifications and a few with headstones, and the area was well-known and recognized as a cemetery and burial area.

. . . .

16. My family has occupied and used the Olala lands for generations as a place to live and farm taro and as a family cemetery and burial area.

17. Pioneer Mill has not use[d] the Olala property for any purpose at any time. Specifically, neither Pioneer Mill nor anyone else has used the property for raising cattle or for growing sugar cane.

18. After I went to Lanai for work, I returned to the property on many occasions to visit family, to caretake the property and to pay respect to my ancestors. It never appeared that Pioneer Mill was using the property for any reason.

. . . .

24. Over the years and until I moved back onto the Olala Property, I always visited the property as often as I could, as did other members of the family. Our family tried to keep the taro growing, and different family members would go to the property to help with the taro.

25. The taro fields are still productive today and the original walls marking the original location of the taro patches at the time of my birth are still in the same original locations today. These walls have been kept up and maintained by our family since they were originally built.

26. The Olala Property has always been maintained as the family cemetery and burial area and the burials have remained intact upon the property starting before the 1800's and remaining to this date.

27. In 1997, I built my new home on the Olala property with the help of my children, who also live on the property with me.

28. Among my visits to the property are the following: 1956 when John Ku died; 1988 to visit Aunty Kaloke; 1994 to visit family; 1997 when Kanekau died.

29. During those visits to the property, Pioneer Mill was never using the Olala property for growing sugar cane or for cattle ranching operations, and there has never been any cattle grazing on the property.

Among the attachments to his affidavit were a chronology of the burials on the property and a map of the burial areas.

Ke'eaumoku also submitted an affidavit wherein he reiterated his father's claims about the continuous use of the property for burials and for growing taro. He also stated that he visited the property as often as he could, and that he moved to the property in 1997 when he built his home there. He stated that Pioneer Mill did not use the property at any time.

The Kapus also produced declaration by former Pioneer Mill employees Albert Dizon (**Dizon**) and Samson Biga (**Biga**). Dizon averred that: "It was well known to me and others that John Paul Kapu had grown up on [the Olala properties] and that the lands belonged to his family." Dizon described, in general terms, his familiarity with the Kapu Ohana and his knowledge that they had lived on the Olala lands. He also stated that he worked for Pioneer Mill Company for 24 years (1971 to 1995), that many workers knew about the burials on the land, and that: "The Olala properties were never used for grazing cattle or for raising sugar cane by Pioneer Mill or by anyone else during the entire time I have been familiar with the properties[.]" Biga also related that he knew about the burials, that the property had not been used for grazing cattle or growing sugar cane, that he knew John Paul Kapu had grown up on the property and that: "My family and I have always considered the Olala property to be the Kapu family home."

The Kapus also produced various maps, photographs of the land at issue, and photographs they identified as showing the presence of their family on the land.

17

Additionally, the Kapus submitted the staff recommendation and minutes of the Maui/Lana'i Islands Burial Council (**Burial Council**) which indicated that the Burial Council recognized the Kapus, among other relatives, were the lineal descendants of Olala.[13] The staff recommendation and minutes were accompanied by a declaration by the Cultural Historian for the State of Hawai'i Department of Land and Natural Resources Historic Preservation Division, indicating that she was the custodian of these records and the copies submitted to the court were true and accurate representations. These document stated, among other things, that the Kapu family had been living on the lands of Olala for generations and that John had been raised on those lands.

However, through a series of orders, the Circuit Court granted Makila's motion to preclude introduction of, *inter alia*, the burial chronology and burial map, testimony or reference to the Burial Council staff recommendation and minutes, testimony by Dizon and Biga, and almost all of the submitted photographic evidence and maps. Makila had argued that this evidence was not

---

[13] As used by the Island Burial Councils of the Department of Land and Natural Resources, "Lineal descendant" means:

with respect to Native Hawaiian skeletal remains, a claimant who has established to the satisfaction of the council, direct or collateral genealogical connections to certain Native Hawaiian skeletal remains, or with respect to non Native Hawaiian skeletal remains, a claimant who has established to the satisfaction of the department, direct or collateral genealogical connections to certain non Native Hawaiian skeletal remains.

Hawaii Administrative Rules (**HAR**) § 13-300-2.

relevant to the issue of whether the Kapus were actual, open, notorious, hostile, continuous, and exclusive possession of Apana 1 between 1951, when Sam Kapu a.k.a. Sam Hakalaau deeded Apana 1 to Pioneer Mill (reserving a life estate for himself that terminated on his death in 1957), and 1997-98, when John built his house there. The Circuit Court denied the Kapus' motion for reconsideration of the granting of Makila's motions *in limine.*

II. POINTS OF ERROR

On appeal, the Kapus argue that the Circuit Court erred by (1) ruling that Makila was entitled to summary judgment on its claim of paper title and (2) ruling that Makila was entitled to summary judgment on the issue of the Kapus' claims of ownership by paper title, lineal descent, and/or adverse possession, because the evidence in the record raised disputed questions of material fact concerning who had superior title. The Kapus allege that the genuine issues of material fact raised by the record include:

a) Was "WAIHOIKAEA OLALA", the same person as "WAIHOIKAEA"? [14]

b) Is KAINOA the same person as KAINOA KIKUE OLALA?

c) Was KAINOA (w) the natural mother of SAMUEL HIKU KAHALIA?

d) Was KAINOA (w) the natural mother of both SAMUEL HIKU KAHALIA and SAMUEL HAKALAAU?

---

[14] This argument was not raised in either the Kapus' memorandum in opposition or supplemental memorandum in opposition to Makila's motion for summary judgment on its claim to paper title and thus, we are not required to consider it. GGS Co. v. Masuda, 82 Hawai'i 96, 104, 919 P.2d 1008, 1016 (App. 1996) ("Because we are in the same position as the trial court when reviewing a motion for summary judgment, we do not consider a new factual issue which was not part of the record and was not presented to the trial court.").

e)    Were SAMUEL HIKU KAHALIA, SAMUEL HAKALAAU and SARAH K. PETER the natural children and the only natural children of KAINOA (w)?

f)    Does the question of whether MAKILA's evidence of title is superior to the evidence brought forward by KAPU involve a determination of disputed material facts?

g)    If MAKILA can establish paper title, which KAPU denies, do the KAPU Defendants have ownership by adverse possession?

III. APPLICABLE STANDARDS OF REVIEW

"An award of summary judgment is reviewed *de novo* under the same standard applied by the circuit court." Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc., 114 Hawai'i 37, 46, 155 P.3d 1138, 1147 (2007) (quoting French v. [Hawaii] Pizza Hut, Inc., 105 Hawai'i 462, 466, 99 P.3d 1046, 1050 (2004) (other citations omitted)). The standard for granting a motion for summary judgment is well settled:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

[Taniguchi, 114 Hawai'i at 46, 155 P.3d at 1147] (quoting Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (citations, internal quotation marks, and some brackets omitted)).

Omerod v. Heirs of Kaheananui, 116 Hawai'i 239, 254-55, 172 P.3d 983, 998-99 (2007).

Furthermore, when reviewing the decision of a lower court to grant or deny a motion for summary judgment,

[appellate courts] can only consider those materials in the record, that were considered by the trial court in its determination of the motion. Thus, in reviewing a summary judgment [appellate courts] will not examine evidentiary documents, such as depositions and admissions, not specifically called to the attention of the trial court, even though they may be on file in the case.

Munoz v. Yuen, 66 Haw. 603, 606, 670 P.2d 825, 827 (1983) (citations omitted); see also Kondaur Capital Corp. v. Matsuyoshi, 134 Hawai'i 342, 350, 341 P.3d 548, 556 (2014) (citing Munoz).

IV.  DISCUSSION

A.  Summary Judgment on Makila's Claim to Paper Title

> In an action to quiet title, the burden is on the plaintiff to prove title in and to the land in dispute, and, absent such proof, it is unnecessary for the defendant to make any showing.  The plaintiff has the burden to prove either that he has paper title to the property or that he holds title by adverse possession.  While it is not necessary for the plaintiff to have perfect title to establish a *prima facie* case, he must at least prove that he has a substantial interest in the property and that his title is superior to that of the defendants.

Maui Land & Pineapple Co. v. Infiesto, 76 Hawai'i 402, 407-08, 879 P.2d 507, 512-13 (1994) (citations omitted).  "The plaintiff's *prima facie* case can be made in various ways, but is usually done by bringing forward evidence of the initial land grant award and tracing ownership forward to the plaintiff through 'mesne conveyances, devise, or descent' or through evidence of adverse possession . . . ."  Alexander & Baldwin, Inc. v. Silva, 124 Hawai'i 476, 482, 248 P.3d 1207, 1213 (App. 2011).  In determining whether a trial court erred in granting a plaintiff's motion for summary judgment on its quiet title action based on a claim to paper title, "[w]e first address whether [the plaintiff-movant] satisfied its initial burden of presenting admissible evidence of its paper title to [the property at issue]."  Makila Land Co. v. Kapu, 114 Hawai'i 56, 70, 156 P.3d 482, 496 (App. 2006).  We also rely on reasonable inferences

21

drawn from such evidence to determine whether the plaintiff-movant has proved its *prima facie* case. Id. at 71, 156 P.3d at 497.

Here, the English translations of L.C.A. 4878-O and R.P. 2664 were signed and certified by their preparers and thus could be properly considered on a motion for summary judgment under Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e). Pioneer Mill Co. v. Dow, 90 Hawai'i 289, 297, 978 P.2d 727, 735 (1999). The translations indicate that Olala was the original grantee of Apana 1. This is not disputed by the Kapus.

The three deeds indicated as "Kaikaamolani to Waihoikaea Olala," "W. Olala & Kauhai," and "Waihoikaea to Kainoa" are also certified as true copies from the records of the Bureau of Conveyances by the Registrar of Conveyances. Their respective translations are certified by the translator. Recitations in these three deeds indicate that: (1) Olala died leaving at least three children: Kaikaamolani, Waihoikaea Olala, and Kua;[15] (2) Kawehineai Olala, the mother of at least Kaikaamolani and Waihoikaea Olala, managed Olala's property upon his death; (3) as of the date the "Kaikaamolani to Waihoikaea" deed was written, July 23, 1866, the property had not been distributed between Olala's children; (4) Kaikaamolani

---

[15]     As noted above, Makila also produced several pages of a Maui Probate Book which it claims establishes that Olala's heirs were judicially determined to be Kaikaamolani, Kua, and Waihoikaea a.k.a. Waihoikaea Olala. However, Makila also submitted a supporting declaration of Donald E. Scearce stating that "[t]he heirs of Olala were identified and judicially determined in Maui Probate Book AA, Pages 31 to 33 to be his children [Kaikaamolani, Kua, and Waihoikaea a.k.a. Waihoikaea Olala]."

transferred all of her interest in the property via the "Kaikaamolani to Waihoikaea" deed which was written in 1866 and recorded in 1873; (5) when Kaikaamolani and Kua died, Waihoikaea Olala indicated in the "W. Olala & Kauhai" deed that he and Kua's son, Kauhai "are the only ones who have an interest [in Olala's property] remaining outside of Kaikaamolani's interest;" (6) by the "W. Olala & Kauhai" deed in 1883, Waihoikaea Olala and Kauhai partitioned the property of Olala such that Apana 2 was "transfer[red] and convey[ed] absolutely unto Kauhai"; (7) in 1898, via the "Waihoikaea to Kainoa" deed, "Waihoikaea" conveyed "absolutely" unto his "daughter/niece" named "Kainoa", "[a]ll that piece of taro land and pasture . . . being Apana 1 belonging to Olala my own father known in Royal Patent Number 2664 Land Commission Award 4878[-]O", and that he did this by warranty deed, stating "I hereby affirm that I have a valid interest to sell in the lands described above, and I shall warrant and defend the same should any persons contest the rights and benefits of Kainoa (f), her heirs and assigns forever."

"Under [Hawaiʻi Rules of Evidence (HRE)] Rule 803(b)(15), a statement contained in a deed is admissible if the matter stated is relevant to the purpose of the document and the circumstances do not indicate a lack of trustworthiness." Infiesto, 76 Hawaiʻi at 407, 879 P.2d at 512. The recitations in the aforementioned deeds regarding the familial relationships between the parties, whether they were alive or dead, and what their respective interests in Olala's property were purported to

be are clearly relevant to the purposes of the deeds; they are meant as assurances that the grantors have the authority to convey certain interests to the grantees. The circumstances here do not indicate that these recitals are untrustworthy; in fact, the subsequent conveyances of the land are consistent with the recital of the final deed that Kainoa received absolute ownership to Apana 1, and excluding the present case, there is no evidence that the right of Kainoa or her successors to convey Apana 1 has ever been challenged. Id. Thus, these recitals are admissible under HRE Rule 803(b)(15): Statements in documents affecting an interest in property.[16] Id. at 406-07, 879 P.2d at 511-12.

Based on these recitations, it is reasonable to infer that interest in Apana 1 passed to Kainoa in fee simple absolute. Though the second deed conveying Apana 2 to Kauhai did not mention Apana 1, as it was apparently a partition of the property between Kauhai and Waihoikaea Olala, who were asserted as the only living people with an interest in Olala's property, it is reasonable that Waihoikaea Olala retained full ownership of Apana 1 for himself. This inference is further strengthened by the warranty deed to Kainoa which does not indicate a conveyance of anything less than a fee simple title in Apana 1.

Makila has also produced admissible evidence that Kainoa's interest in Apana 1 passed to Samuel Hakalaau. There is no evidence that Kainoa left a will or conveyed Apana 1 during

---

[16] Alternatively, they would be admissible under HRE Rule 803(b)(16): Statements in ancient documents.

24

her life. If she had title to Apana 1 when she died, and died intestate, the law at the time would have resulted in her interest in Apana 1 passing equally between her issue.[17] The following evidence supports the conclusion that Kainoa's interest passed to three of her children, with their interest subsequently passing to Pioneer Mill through Samuel Hakalaau.

First, Samuel Hakalaau's status as Kainoa's son is supported by John's 1997 affidavit stating that "Samuel Kapu (aka) Samuel Hakalaau is the son to Hiku Hakalaau and Kainoa Kukue Olala[,]" and the record of marriage attached to that affidavit which identifies "Hiku" and "Kainoa" as the father and mother, respectively, of "Samuel Kapu."[18] The affidavit is admissible as the admission of a party-opponent (HRE Rule 803(a)(1)) while the record of marriage would be admissible as a record of vital statistics (HRE Rule 803(b)(9)).

Second, Samuel Hiku Kahalia's death certificate lists "(Unknown) Hakalaau" and "(Unknown) Kainoa" as his father and

---

[17] Although Makila did not offer evidence of when Kainoa died, at least by 1928, Samuel Hakalaau, Samuel Hiku Kahalia, and Sarah K. Peter indicated that they had an interest in Apana 1 by virtue of their lease to Pioneer Mill. From 1898, when Kainoa received title to Apana 1 from Waihoikaea, until 1928, the property of any person dying intestate would descend equally between his or her living children and the issue of any deceased child by right of representation. Civil Code 1897, § 2106; Revised Laws of Hawai'i (RLH) § 3305 (1925); § 4813 (1935).

[18] Note that Makila also submitted what appears to be a search result from the website "familysearch.org" showing "HIKU HAKALAAU" and "KAINOA KIKUE OLALA" as the parents of "SAMUEL HAKALAAU." Although the Kapus did not provide hearing transcripts to this court, there appears to be nothing in the record indicating an objection to the admissibility of this document. The information appears to come from the The Church of Jesus Christ of Latter-day Saints a.k.a. the LDS Church. However, we express no opinion as to whether this document would be admissible under HRE Rule 803(b)(11) as a "regularly kept record of a religious organization."

mother, and bears the signature of "Sam Hakalaau" as the informant. Again, this is admissible as record of vital statistics under HRE Rule 803(b)(9). The close similarity and consistency between the names of Samuel Hiku Kahalia's parents and Samuel Hakalaau's parents supports the assertion that Samuel Hiku Kahalia and Samuel Hakalaau had the same parents.

Third, there is the recitation in the 1951 deed from Samuel Hakalaau to Pioneer Mill indicating that Sarah K. Peter was his sister. Thus, it can be inferred that Sarah K. Peter was a sister of Samuel Hiku Kahalia as well.

Fourth, there is the 1928 lease as well as the 1943 lease of Apana 1 from Samuel Hiku Kahalia, Samuel Hakalaau, and Sarah K. Peter to Pioneer Mill. Copies of these leases were certified as true and correct copies of the records of the Bureau of Conveyances and thus were admissible under HRE Rule 803(b)(14): Record of documents affecting an interest in property. These leases evidence that Samuel Hiku Kahalia, Samuel Hakalaau, and Sarah K. Peter all had an interest in Apana 1.

Fifth, there is the January 27, 1951 deed from Samuel Hakalaau to Pioneer Mill, the October 19, 1951 deed from Sarah K. Peter to Samuel Hakalaau, and the November 5, 1951 deed from Samuel Hakalaau to Pioneer Mill. The January 27, 1951 deed granted "all of [Samuel Hakalaau's] right, title and interest, believed to be not less than a one-half (1/2) undivided interest, in . . . Apana 1[.]" This came after Samuel Hiku Kahalia's death in 1949 (as indicated on his death certificate referenced above).

26

At this time, Sarah K. Peter was also alive and claimed a one-half interest in Apana 1, as indicated by the recitations in her October 19, 1951 deed to Samuel Hakalaau. From these deeds, it appears that after Samuel Hiku Kahalia's passing, his interest in Kainoa's property passed to Samuel Hakalaau and Sarah K. Peter so that they each had an undivided one-half interest in Apana 1.[19] Samuel Hakalaau conveyed his interest to Pioneer Mill via the January 27, 1951 deed. After Sarah K. Peter conveyed her one-half interest to Samuel Hakalaau via the October 19, 1951 deed, he in turn conveyed that interest to Pioneer Mill via the November 5, 1951 deed. Thus, Makila established a chain of title in Apana 1 from Olala to Pioneer Mill.

Nevertheless, we conclude that Makila did not establish that it received title to Apana 1 from Pioneer Mill. It provided a January 16, 2001 deed from Pioneer Mill conveying certain properties to Makila. Certified as a true copy of the record of the Bureau of Conveyances, this deed is admissible under HRE Rule 803(b)(14). However, the list of lands purportedly conveyed by this deed does not make any reference to Apana 1 of L.C.A. 4878-O, R.P. 2664. This absence was noted by the Kapus in their memorandum in opposition to Makila's November 18, 2009 summary judgment motion and Makila did not respond to this point in its

_____

[19] The law of intestacy in effect at the time of Samuel Hiku Kahalia's death provided that if a person died intestate with no issue, mother, father, or widow, his estate would descend to his brothers and sisters and to the children of any deceased brother or sister by right of representation. RLH § 12073 (1945).

replies. The list attached to the deed from Pioneer Mill makes reference to TMK No: (2) 4-6-21:4 and Makila notes in its opening brief to this court that its initial complaint described Apana 1 as situated "within TMK (2) 4-6-21-4." However, allegations in a complaint is not evidence which may support a summary judgment motion. Tri-S Corp. v. W. World Ins. Co., 110 Hawai'i 473, 494 n.9, 135 P.3d 82, 103 n.9 (2006). Makila points to no evidence in the record which links this TMK number to Apana 1. After a careful review of the record, we were unable to find such a link.[20] Without this essential link, we cannot find that Makila satisfied its burden of proving its prima facie claim of paper title.

For the foregoing reasons, we vacate the Circuit Court's Judgment insofar as it granted summary judgment to Makila on its claim of paper title to Apana 1 and thus, quieted title in favor of Makila.

B. The Kapus' Adverse Possession Counterclaim

Despite our holding that Makila was unable to establish its prima facie claim to paper title and was not entitled to quiet title, we may nonetheless uphold the Circuit Court's granting of Makila's motion to dismiss the Kapus' adverse

_____

[20] We note that the Burial Council staff recommendation and minutes produced by the Kapus make reference to the lands of Olala being located on lands identified as TMK: 4-6-21 parcels 004, 005, 006, 012, and 015. However, the Circuit Court precluded admission of this document, and even if it were admissible, the lands of Olala are indicated to be Apanas 1 and 2, and it is not indicated which parcel(s) corresponds to which Apana(s). The Kapus also submitted a burial chronology marked "Exhibit D-1" which describes Apana 1 as being located on "T-M-K- 04-06-21:05," not 4-6-21:04. This document was also excluded by the Circuit Court.

possession counterclaim if we find that there is insufficient evidence on the record supporting this counterclaim such that a trial would be useless. As we held in <u>Alexander & Baldwin</u>, 124 Hawai'i at 484, 248 P.3d at 1215:

> we reject [the] argument that it is improper for a quiet title plaintiff to seek partial summary judgment on the issue of whether a particular defendant has an interest in the subject property without the plaintiff first establishing its *prima facie* claim to title. Quiet title plaintiffs, like any other claimant, may use the procedure set forth in HRCP Rule 56(a) to eliminate any portion of the case for which trial is not required, including the elimination of any defendant-claimant whose claim to an interest in the subject property is without sufficient evidentiary support to create a genuine issue of material fact.

<u>See</u> also <u>First Hawaiian Bank v. Weeks</u>, 70 Haw. 392, 400, 772 P.2d 1187, 1192 (1989) (upholding summary judgment in favor of the plaintiffs on the defendants' counterclaims where the plaintiffs established that there would be no competent evidence to support a judgment for the defendants if the case went to trial).

The March 22, 2012 Order dismissing the Kapus' adverse possession counterclaim with prejudice was granted pursuant to Makila's February 14, 2012 motion for summary judgment. The supreme court has explained the respective burdens of a moving party and a non-moving party on a motion for summary judgment:

> [T]he moving party has the initial burden of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. The moving party may discharge his or her burden by demonstrating that [,] if the case went to trial[,] there would be no competent evidence to support a judgment for his or her opponent. Cf. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 ... (1986) (a party moving for summary judgment under Federal Rules of Civil Procedure Rule 56 need not support his or her motion with affidavits or similar materials that negate his or her opponent's claims, but need only point out that there is [an] absence of evidence to support the

opponent's claims ). For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless.

When a motion for summary judgment is made and supported,

an adverse party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or as otherwise provided in HRCP Rule 56, must set forth specific facts showing that there is a genuine issue for trial. If he or she does not so respond, summary judgment, if appropriate, shall be entered against him or her.

HRCP Rule 56(e) (1998). In other words, a party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, nor is he or she entitled to a trial on the basis of a hope that he can produce some evidence at that time. On motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party.

Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i 277, 301, 172 P.3d 1021, 1045 (2007) (quoting Young v. Planning Comm'n of Kaua'i, 89 Hawai'i 400, 407, 974 P.2d 40, 47 (1999) (emphasis omitted).

Where the moving party will not bear the ultimate burden of proof at trial,

summary judgment is proper when the non-moving party

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 302, 172 P.3d at 1046 (quoting Hall v. State, 7 Haw. App. 274, 284, 756 P.2d 1048, 1055 (1988)) (emphasis omitted).

In this light, we consider whether the parties in the present case satisfied their respective burdens with regards to

Makila's February 14, 2012 motion for summary judgment on the Kapus' adverse possession counterclaim.

The elements of adverse possession are actual, open, notorious, hostile, continuous, and exclusive possession for the statutory period. <u>Wailuku Agribusiness Co. v. Ah Sam</u>, 114 Hawai'i 24, 33, 155 P.3d 1125, 1134 (2007).

> Actual, open, and notorious possession is established where a claimant shows use of the land to such an extent and in such a manner as to put the world on notice by means so notorious as to attract the attention of every adverse claimant. The element of hostility is satisfied by showing possession for oneself under a claim of right, and such possession must import a denial of the owner's title. Continuity and exclusivity of possession require that the adverse possessor's use of a disputed area rise to the level which would characterize an average owner's use of similar property.

<u>Id.</u> at 33-34, 155 P.3d at 1134-35 (citations, internal quotation marks, ellipses, and brackets omitted). To prevail, an adverse possession claimant has the burden of proving each of the above elements by "clear and positive proof." <u>Id.</u> at 33, 155 P.3d at 1134.

Hawaii Revised Statutes (HRS) § 669-1(b) (1993) provides the statutory period for establishing title to real property by adverse possession. Since 1973, HRS § 669-1(b) has set the statutory period to be at least twenty years. <u>Wailuku Agribusiness</u>, 114 Hawai'i at 33 n.19, 155 P.3d at 1134 n.19. However, between 1898 and 1973, the statutory period was only ten years. <u>Id.</u> Thus, to ultimately prevail on their counterclaim, the Kapus must provide clear and positive proof that they

satisfied all the elements of adverse possession at least ten years before 1973 or at least twenty years after 1973.  Id.

It appears that Makila's position is that adverse possession could not begin to run until 1951 when Samuel Hakalaau (who was also known as Samuel Kapu, John's hanai father) conveyed paper title to Pioneer Mill.  As Makila argued in its February 14, 2012 motion for summary judgment:

> [A]ny use or occupancy of the land by Defendant John Paul Kapu after his birth in 1932 until he moved to Lanai in 1946, is explained by his testimony that he was the foster child of Samuel Kapu (aka: Samuel Hakalaau) in whom paper title to an undivided interest in the land had vested by 1928, and who conveyed the land to Plaintiff's predecessor, Pioneer Mill, in 1951.

In support of this contention, Makila cited to a declaration from October 2012 wherein John stated, "I lived on the Olala property until I was 14 years old, when I went to Lanai for a job."  John also declared that:

> A photograph of the property, including the house I was raised in is attached as Exhibit "C" . . . . The front of the house (along with my hanai parents, Uncle Samuel Kapu and Auntie Julia Kaleo) is also shown in Exhibit "D".  My hanai parents had lived in the house for at least 27 years prior to my birth.[21]

In its reply, Makila added a citation to its previously submitted "Exhibit 14," John's 1997 affidavit.  In this affidavit, John averred that "Samuel Kapu (aka) Samuel Hakalaau" was the son of Hiku Hakalaau and Kainoa Kukue Olala and the husband of Julia Kealo Kaleo.

---

[21]     The Kapus do not allege that John's hanai parents formally adopted John.

Makila offered evidence that between 1952 and 1997, John resided in Honolulu although he stated that he visited the land as often as he could, including "1956 when John Ku died; 1988 to visit Aunty Kaloe; 1994 to visit family; [and] 1997 when Kanekau died."[22] Makila also cited John's deposition wherein he stated that he never claimed to own the land and had never paid real property taxes on the land.

With regards to Keʻeaumoku's potential claim, Makila cited Keʻeaumoku's deposition as evidence that from his birth up until 1997, he resided on Oahu and no one was living on the Olala property, although "a lot of times [his family] used to do a lot of harvesting of the Wiliwili seed, and 'we always used to go up just to take care of the graves . . .'" Makila pointed out that Keʻeaumoku did not identify the property in a financial disclosure statement. As to both John and Keʻeaumoku's alleged visits to the property, Makila cited Okuna v. Nakahuna, 60 Haw. 650, 656-57, 594 P.2d 128, 132 (1979), for the proposition that, as a matter of law, infrequent visits to a property do not constitute possession.

---

[22] In support of the assertion that John resided in Honolulu from 1952 to 1997, Makila cited several exhibits it had presented earlier wherein John's address indicated that he was living in Honolulu in the years 1953, 1957, 1960, 1963, 1974, 1984, and 1997. These exhibits included birth, marriage, and death certificates, as well as several pages of Honolulu telephone directories. Courts generally take judicial notice of city telephone directories without requiring additional foundational evidence. See, e.g., Harris v. Beech Aircraft Corp., 248 F. Supp. 599, 601 (E.D. Tenn. 1965), Williams v. Campbell Soup Co., 80 F. Supp. 865, 868 (W.D. Mo. 1948), Modern Graphics, Inc. v. Belger Cartage Servs., Inc., 668 S.W.2d 111, 114 (Mo. Ct. App. 1984). In support of the dates that John allegedly visited the property, Makila cited to a 2010 declaration by John.

Makila argued that:

> Even if the facts evidenced that one of the Kapu defendants was in actual, open, notorious, hostile, continuous, and exclusive possession of the land for 20 years **before** his 2009 counterclaim, there is **no** evidence that he acted in good faith as mandated by HRS § 669-1(b) - meaning that, under all the facts and circumstances a reasonable person would believe that he has an interest in title to the lands and such belief is based on inheritance, a written instrument of conveyance, or the judgment of a court of competent jurisdiction.

The Kapus claim that John, with Keʻeaumoku's help, built a house on Apana 1 around 1997.[23] Makila did not dispute this claim, but correctly pointed out that residence beginning as early as 1997 would not satisfy the twenty-year statutory period.

Having pointed out the absence of competent evidence to support the Kapus' adverse possession claim, Makila satisfied its initial burden. Exotics Hawaii-Kona, 116 Hawaiʻi at 301, 172 P.3d at 1045. Thus, the burden shifted to the Kapus to respond with specific facts showing that there was a genuine issue for trial. Id.

We note that, in their memorandum in opposition to Makila's February 14, 2012 motion for summary judgment, the Kapus provided several pieces of evidence that the Circuit Court precluded from being introduced at trial. These include a March 1939 field map from Pioneer Mill titled "Taro Patches in Kauaula Valley" which was to be introduced as the Kapus' Exhibit D-5, the staff recommendation of the Burial Council, and the Burial

---

[23]      At the time of the proceedings in the Circuit Court, John lived in this house and Keʻeaumoku indicated that he also lived there before building another home for himself around 2004 or 2005. It appears, however, that Keʻeaumoku's new home was built outside of the lands the Kapus claim by adverse possession.

Council minutes. The Kapus also referenced the declarations of Dizon and Biga even though the court held that they would not be allowed to testify at trial. On appeal, the Kapus urge us to consider documents and statements which the Circuit Court previously held to be inadmissible, but they do not allege that the Circuit Court erred in so ruling. Points not raised by the appellant may be deemed waived. Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4)&(7). In addition, as noted above, Makila's motions *in limine* concerning pre-1951 evidence were grounded in the argument that the period of adverse possession did not begin to run until 1951, or perhaps more accurately until Samuel Hakalaau's death on August 18, 1957,[24] as until his life estate terminated at his death, the Kapu family's possession of the land would not have been hostile to Pioneer Mill's ownership interest. Thus, evidence of earlier use and occupancy was not relevant. In addition, although both Dizon and Bigo referenced knowing that John grew up on the property and that they always considered the Olala property to be the Kapu family home, neither declared any facts concerning the Kapus' occupation of the property during the relevant period.[25]

---

[24] Ke'eaumoku submitted a copy of Samuel Hakalaau's death certificate with a January 26, 2010 declaration.

[25] We acknowledge that the Kapus ultimately averred that Samuel Kapu was not the same person as Samuel Hakalaau, but these bare assertions are contradicted by their own earlier declarations and memoranda, and the records that the parties submitted, including marriage and death certificates. We conclude that the evidence submitted to the Circuit Court was not susceptible to the Kapus' interpretation that Samuel Kapu and Samuel Hakalaau were different people. See Waimea Falls Park, Inc. v. Brown, 6 Haw. App. 83, 97,
(continued...)

Thus, although the Kapus allege that their family has occupied Apana 1 for generations and that John in fact was raised on the lands, they have not presented evidence that anyone resided there from 1951 (or 1957) to 1997. However, one does not need to reside on land to claim it by adverse possession. Petran v. Allencastre, 91 Hawai'i 545, 557, 985 P.2d 1112, 1124 (App. 1999). Accordingly, the Kapus' adverse possession claim could be based on something besides actual residence on Apana 1.

The Kapus claimed that when John was not living on the property, he and other members of the family would visit the land "as often as [they] could," that the family "tried to keep the taro growing," and that different family members would go to the property to help with the taro. In a declaration submitted as evidence in support of the Kapus' memorandum in opposition, John stated:

> 16.   My family has occupied and used the Olala lands for generations as a place to farm taro and as a family cemetery and burial area.
>   . . . .
> 24.   Over the years and until I moved back onto the Olala Property, I always visited the property as often as I could, as did other members of the family. Our family tried to keep the taro growing, and different family members would go to the property to help with the taro.
> 25.   The taro fields are still productive today and the original walls marking the original location of the taro patches at the time of my birth are still in the same original locations today. These walls have been kept up and maintained by our family since they were originally built.
>   . . . .
> 28.   Among my visits to the property are the following:  1956 when Joh Ku died; 1988 to visit Aunty Kaloke; 1994 to visit family; 1997 when Kanekau died.

---

[25](...continued)
712 P.2d 1136, 1145 (1985) (citations omitted) ("when the evidence is not susceptible to the interpretation which the non-moving party seeks to give it, the motion for summary judgment should be granted").

Ke'eaumoku made the same claims in his own declaration, but with no specifics concerning, for example, how often he visited the property, prior to moving there in 1997. The Kapus also submitted a field map purportedly showing taro patches on the land (although this map had already been ruled inadmissible, as discussed above).

In Morinoue v. Roy, the Hawai'i Supreme Court stated that:

> In Okuna v. Nakahuna, 60 Haw. 650, 656-57, 594 P.2d 128, 132 (1979), this court observed that infrequent visits to a property to pick and gather fruits can hardly be said to constitute continuous possession or even actual possession at all. . . On the other hand, full-scale and continuous cultivation, tillage of the soil, planting, and harvesting a crop have been described as superior indicia of actual and continuous possession for purposes of establishing adverse possession.
>
> Between these two extremes lies a gray area, in which the courts must assess the strength of the record on a case-by-case basis.

86 Hawai'i 76, 81, 947 P.2d 944, 949 (1997) (citations, internal quotation marks, and brackets omitted). The following discussion shows the Morinoue court's reasons for ultimately vacating the lower court's granting of summary judgment in favor of the plaintiffs (the Morinoues) who claimed title by adverse possession:

> The sole evidence as to the extent and the nature of the Morinoues' "possession" of L.C.A. 9932 (as well as that of their predecessor in interest, Kinshiro Yamamoto) consists of the allegations set forth in paragraphs four and five of Ayako Morinoue's affidavit. Paragraph four simply avers that "the property has been farmed by Plaintiffs since 1924." Although this factual allegation is not, as the Roys suggest, a conclusion of law or a finding of "ultimate fact," it is nevertheless, in our view, too vague, in and of itself, to sustain a claim of adverse possession, especially on summary judgment.
>
> Paragraph five, which alleges that "Yamamoto planted

37

> coffee trees on the land prior to selling the land to
> Affiant's mother, and Plaintiffs have planted trees and
> tended the coffee trees or hired others to tend the coffee
> trees since 1924," offers no specifics as to how many trees
> were planted, where they were planted, how much of the land
> was occupied by the trees, what activities were involved in
> "tending" the trees, how often the trees were harvested, or
> whether such cultivation was visible and evident to the
> public. In other words, paragraph five is insufficient as a
> matter of law to establish that the Morinoues made "use of
> the land to such an extent and in such a manner as to put
> the world on notice" by means "so notorious as to attract
> the attention of every adverse claimant."
>
> Indeed, neither paragraph four nor five constitutes
> "clear and positive proof" that the Morinoues' "possession"
> of L.C.A. 9932 was known to anyone in the community and,
> therefore, "notorious." Construing Ayako Morinoue's
> affidavit in the light most favorable to the Roys, we must
> hold that the Morinoues have not established-by clear and
> positive proof-a *prima facie* case of actual, open,
> notorious, and continuous possession of the subject property
> for any particular period of time.

Id. at 81-82, 947 P.2d at 949-50 (citations and brackets
omitted).

Many of the allegations contained in the Kapus' above-
referenced declarations are quite similar to the evidence in
Morinoue. They aver that the Kapu family has been growing taro
on the land since long before 1951 but do not provide the
specific details that the Morinoue court found lacking in the
case before it. However, it is important to recognize that the
procedural posture in Morinoue is distinguishable from the
present case in that the party claiming title by adverse
possession (the Morinoues) were also the party moving for summary
judgment on their claim. Id. at 77, 947 P.2d at 945. Thus, as
indicated above, the court was obligated to construe the evidence
in the light most favorable to the non-moving party. In the

38

present case, the Kapus are the non-moving party and thus, the evidence must be construed in their favor.

Nevertheless, there are no inferences that we can draw from the Kapus' proffered evidence that would shed light as to the specific character of the Kapu family's use of the land for taro cultivation during the relevant period.[26] Allegations that the family tried to keep the taro growing, that different members would go to help with the taro at unspecified periods, and that the family maintained the original walls are not susceptible to reasonable inferences regarding the scale of the taro cultivation, whether it was continuous or merely sporadic in nature, whether such maintenance would be noticed at all. In other words, even accepting that there was taro growing on Apana 1 and that members of the Kapu family traveled there from time to time to tend to it and maintain walls, with no specificity as to

---

[26]     For the purposes of this analysis, we will assume that use of the land by members of the Kapu family, not just John and Keʻeaumoku, may be sufficient to satisfy the elements of adverse possession. The possession of one or more family members can be tacked together for the statutory period. "[W]here there is such a privity of estate or title as that the several possessions can be referred to the original entry they may be joined, and are regarded as a continuous possession . . . ." Kainea v. Kreuger, 31 Haw. 108, 115 (Haw. Terr. 1929) (citations omitted). "The only essential of the transfer is that the predecessor passes it to the successor by mutual consent . . . ." Id. (citation and internal quotation marks omitted). Privity generally exists between members of a family. 2 C.J.S. Adverse Possession § 167 (2013) ("Where a family has lived in continuous adverse possession of land, the title being in one of them, or in different members of the family at different times, they stand in such privity one to another that the tacking of their possessions is permissible.")
        Additionally, the members of the Kapu family could possess the land as tenants in common. Magoon v. Hong Yee Chuck, 31 Haw. 661, 661 (Haw. Terr. 1930) ("When two or more persons together hold land, not adversely to each other but adversely to the true owner, for the statutory period and with all the elements necessary to the creation of title by adverse possession, they become, in the absence of any understanding or agreement to the contrary, tenants in common and not joint tenants.")

frequency or the period of time, such evidence is insufficient establish the existence of the essential element of "use of the land to such an extent and in such a manner as to put the world on notice by means so notorious as to attract the attention of every adverse claimant." Wailuku Agribusiness, 114 Hawai'i at 33, 155 P.3d at 1134 (citation and internal quotation marks omitted).

In deposition, Ke'eaumoku also mentioned that before 1997, his family used to harvest the *wiliwili* seed on the property, and possibly a mushroom called *"Pepeiao"* (although he was not clear as to whether the *pepeiao* was harvested specifically on the property at issue or on the surrounding lands in the valley). However, as previously noted, infrequent visits to harvest plants does not constitute possession. Morinoue, 86 Hawai'i at 81, 947 P.2d at 949. Further, Ke'eaumoku did not mention the time period during which these harvests occurred, *i.e.* whether they occurred over the entire statutory period. Thus, the reported incidents of gathering of *wiliwili* or *pepeiao* is not a sufficient basis for the Kapus' adverse possession claim.

Finally, the remainder of the Kapus' adverse possession claim rests on the argument that the Kapus have used Apana 1 as a family burial area both before 1951 and continuing to the present day. Specifically, the Kapus alleged that:

> b.    The Kapu family cemetery with obvious burials and
> gravesites remained on the property from 1951 to 1997, and
> John Paul Kapu continued to use the Olala Property for the

40

> Kapu family cemetery during that time frame. This use meets both the 10 year requirement and the 20 year requirement for adverse possession.

> c. The Kapu family cemetery with obvious burials and gravesites remained on the property from 1951 to 1997, and Jonah Ke'eaumoku Kapu continued to use the Olala Property for the Kapu family cemetery from April 28, 1963 to May 4, 1973 (10 years) and from April 28, 1963, to 1997 (34 years).

In John's declaration submitted with the Kapus' memorandum in opposition, he states the following:

> 5. The Olala Property has always been used as the Kapu family cemetery, graveyard and burial area, both before my birth and always thereafter.
> 6. Many of my ancestors and kupuna are buried on the Olala property with burials occurring before and during my lifetime.
> 7. The burials are obvious to the eye, and many are marked with stone identifications and a few with headstones, and the area was well-known and recognized as a cemetery and burial area.
> . . . .
> 18. After I went to Lanai for work, I returned to the property on many occasions to visit family, to caretake the property and to pay respect to my ancestors. It never appeared that Pioneer Mill was using the property for any reason.
> . . . .
> 26. The Olala Property has always been maintained as the family cemetery and burial area and the burials have remained intact upon the property starting before the 1800's and remaining to this date.

Ke'eaumoku makes essentially the same allegations in his own declaration, including the claim that the property "has always been maintained as the family cemetery and burial area and the burials have remained intact upon the property starting in the 1800's and remaining to this date."

However, even accepting these allegations as true, the fact that the Kapus' ancestors were buried on the land at the time it was conveyed to Pioneer Mill and that they maintained the graves over the years does not, in itself, constitute actual possession. Bonham v. Loeb, 18 So. 300, 301-02 (Ala. 1895)

41

(although plaintiff's grandfather, husband, and children were buried on a piece of property, she visited frequently, and had another person attend to the area when she moved away, the court held that "No such acts of control and possession, such as she sets up, can ever amount to adverse possession.") (citation omitted); see also Gibson v. Berry Cemetery Ass'n, 250 S.W.2d 600, 601-02 (Tex. Civ. App. 1952) ("It is also the settled law in this State that a living person who has relatives buried in a graveyard is not, by reason of that single fact, thereby vested with title to the land on which such relative is buried, or with any right therein other than that of visitation, ornamentation, and the protection of the graves of such relatives as are buried thereon from desecration[.]") (citation omitted).

The Kapus imply, but have provided no specific names, dates, or other evidence that burials occurred after Pioneer Mill acquired the property.[27] The Kapus' assertions that the "burials are obvious to the eye, and many are marked with stone identifications and a few with headstones," does not provide evidence of any post-1951 burials. Thus, without specific facts supporting the Kapus' claim of continued use of Apana 1 as a burial site, allegedly constituting open or notorious possession, they have not discharged their burden in opposing summary

_____

[27]     We note that the document entitled "Burial Chronology by John Paul Kapu" which the Kapus sought to introduce into evidence and which the Circuit Court precluded, would not, even if admissible, offer any evidence of burials occurring after 1951. In fact, the most recent burial noted in this document occurred in 1938.

42

judgment. "[A] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, nor is he or she entitled to a trial on the basis of a hope that he can produce some evidence at that time." Exotics Hawaii-Kona, 116 Hawai'i at 301, 172 P.3d at 1045 (citation and emphasis omitted).

In sum, the Kapus have not provided evidence of actual, open, notorious, and continuous use of Apana 1 for the statutory time period, and therefore failed to make a sufficient showing to establish the existence of the essential elements of their case, on which they would bear the burden of proof at trial. See id. at 302, 172 P.3d at 1046. Thus, Makila was entitled to summary judgment on the Kapus' adverse possession counterclaim.

V. CONCLUSION

For the foregoing reasons, the Circuit Court's May 8, 2012 Final Judgment is vacated in part, insofar as it granted summary judgment on Makila's paper title claim and quieted title in favor of Makila. However, it is affirmed in all other respects. We remand this case to the Circuit Court for proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawai'i, October 21, 2016.

On the briefs:

James Richard McCarty,
for Defendants-Appellants.

Michael W. Gibson,
(Ashford & Wriston)
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge